# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

JONTE ROBINSON,

*Defendant.*

Criminal Action No. 04-128 (RDM)

## <u>**MEMORANDUM OPINION AND ORDER**</u>

On August 1, 2000, more than half his lifetime ago, then 18-year-old Jonte Robinson aided and abetted a double murder.  He subsequently pleaded guilty to conspiracy to distribute illegal narcotics and to participating in a racketeering conspiracy, which included the murders as overt acts.  Pursuant to the plea agreement, Robinson was sentenced to a term of incarceration of 25 years.  He has now served almost sixteen years of that sentence (not including good-time credit).

Before the Court is Robinson's motion seeking compassionate release.  Dkt. 1404.  He argues that he is at heightened risk of grave illness or death should he contract COVID-19 and that he no longer poses a danger to the community.  In support of his motion, Robinson submits his medical records, offers of employment, and letters from his fiancée, mother, sister, brother, niece, grandson, friend, and the Recreation Specialist at FCC Hazelton who taught Robinson in the prison's graduate equivalency degree ("GED") program.  The motion is substantial.  But for the reasons that follow, the Court concludes that extraordinary and compelling reasons do not currently warrant Robinson's release.

Accordingly, Robinson's motion will be **DENIED**.

# I. BACKGROUND

## A. Factual Background

Jonte Robinson was born to bleak circumstance. His mother "had drug dependency issues involving cocaine base and heroin," while "his father was largely absent from his life." Dkt. 1404 at 39 (citation and internal quotation marks omitted). As his sister Rhonda explains, Robinson "had a very rough childhood"—"his mom and dad abandoned him at a young age," and "[h]e had to grow up in the streets alone." Dkt. 1404-5 at 2 (Ex. E). Getting arrested, Rhonda says, "saved [her] brother's life." *Id.* Similarly, Robinson's niece, Ida, recounts: "[Jonte] was never allowed the chance to be a child; from the time that he could walk and talk, he was taking care of himself. His mother abused drugs, and his father was not consistently around[.]" *Id.* at 4 (Ex. E). And as Robinson's eldest sister explains, "Jonte saw things that a child should have never seen, such as removing drug needles from his mother or her overdosing or his father displaying drugs on the kitchen table for all to witness or making sure his younger brother had food to eat, because his mother would disappear for days or too high to provide a meal for [her] kids." Feb. 23, 2021 Hrg. Tr. (Rough at 16) (Robinson-Omotosho).

At the age of 14—yes, 14—Robinson became a father himself. Dkt. 1404 at 39. That same year, "his uncle, who was like a father to him, died; his brother died after battling a life-threatening illness; and one of his friends committed suicide *in his presence*." *Id.* (internal quotation marks omitted). Because Robinson was, at that time, "too young to obtain a job, [] he turned to what he witnessed growing up in a low-income environment, which was selling drugs." Dkt. 1404-5 at 4 (Ex. E). Soon after, Robinson dropped out of high school, starting but never completing the twelfth grade.

Robinson's drug dealing meanwhile took on significant proportions.  He joined a criminal enterprise that came to be known as "the 18th and M Street crew."  Dkt. 742 at 1.  As part of that enterprise, "Jonte Robinson and other members of the conspiracy were involved in acquiring and redistributing for profit, wholesale and retail quantities of PCP, ecstasy and cocaine base, also known as crack cocaine."  *Id.* at 2.  Over the course of Robinson's participation in the enterprise, he agrees that he was "accountable for aggregated drug quantities of at least thirty kilograms of mixtures and substances containing PCP, at least one kilogram of ecstasy, and at least 1.5 kilograms of crack cocaine."  *Id.*

On August 1, 2000, Jonte Robinson drove the car of his co-conspirator, Larry Gooch, to William Cunningham's apartment.  *Id.*  In the car were Gooch and Tommie Dorsey, each armed with a firearm, as well as a fourth co-conspirator, Herbert Jones.  *Id.*  Upon arriving at Cunningham's apartment, Gooch and Dorsey "forcibly entered," encountering Cunningham and Christopher Lane inside.  *Id.*  Gooch and Dorsey then began shooting, hitting both Cunningham and Lane in the head.  Robinson then "entered the apartment and located and took U.S. currency and suspected cocaine base or crack cocaine," after which he, Gooch, Dorsey, and Jones fled.  *Id.* Lane and Cunningham both died from the gunshot wounds they sustained.  *Id.* at 2–3.

**B.    Procedural Background**

Robinson was arrested in June 2003.  He subsequently pleaded guilty pursuant to a Rule 11(c)(1)(C) plea agreement to one count of conspiracy to distribute and possess with intent to distribute one kilogram or more of phencyclidine, ecstasy, and 50 grams or more of cocaine base, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(l)(A)(iii) and (iv), and one count of conspiracy to participate in racketeer influenced corrupt organization, in violation of 18 U.S.C. §§ 1962(d) and 1963(a).  Dkt. 741 at 1.  Two of the overt acts for which Robinson accepted responsibility were

the first-degree felony murders of Cunningham and Lane.  *Id.* at 1–2.  The plea agreement

required that Robinson serve a 300-month term of incarceration.  *Id.* at 3; *see also* Fed. R. Crim.

P. 11(c)(1)(c).[1]  On November 30, 2007, Robinson was sentenced to 291 months' incarceration

to be followed by five years of supervised release.  Dkt. 942.[2]  As of today, Robinson has served

roughly 15 years and 8 months of his 25-year sentence.[3]  Dkt. 1410 at 4.  Accounting for good-

time credit, he has roughly five more years to go.  *Id.*

On October 21, 2020, Robinson submitted a handwritten letter to the Court, asking the

Court to grant him compassionate release.  Dkt. 1396 at 1.  Robinson noted that he had been

diagnosed with hypertension; that his grandfather and uncle had died from hypertension; that he

wanted to make it home to his mother, who was soon scheduled to have surgery; that he had

obtained his "GED"; and that he had "employment lined up" at a construction company.  *Id.* at

1–2.  The Court subsequently requested that the Federal Public Defender ("FPD") brief the

matter on Robinson's behalf, *see* Minute Order (Oct. 30, 2020), a task which FPD Celia Goetzl

has undertaken and performed admirably.

The Court subsequently set a briefing schedule.  *See* Minute Order (Nov. 9, 2020).

Robinson and his counsel then filed additional materials for the Court to consider.  *See* Dkt. 1402

(Robinson's second letter requesting compassionate release); Dkt. 1404 (operative

---

[1]  After pleading guilty, Robinson moved to withdraw his plea.  *See* Dkt. 789; Dkt. 807; Dkt. 834; Dkt. 851 Dkt. 903.  The Court denied Robinson's requests to withdraw the guilty plea, *see* Dkt 841; Dkt. 906, and Robinson appealed, Dkt. 909.  On December 1, 2009, the D.C. Circuit affirmed his conviction.  *See United States v. Robinson*, 587 F.3d 1122 (D.C. Cir. 2009).

[2]  Nine months were subtracted from the agreed-upon sentence of 300 months to account for time that Robinson was held on Superior Court charges that were incorporated into the instant case. Dkt. 905.

[3]  About 24 months of his period of incarceration does not count toward his federal sentence and was, instead, applied to a separate Superior Court sentence.  Dkt. 1404 at 7 n.7.

compassionate release motion filed by the FPD); Dkt. 1405 (sealed exhibits on behalf of Robinson's motion). On January 25, 2021, the government filed its opposition, Dkt. 1410, including several sealed exhibits in support of the motion, Dkt. 1411. The government then filed supplemental authority for the Court to consider. Dkt. 1412. On February 4, 2021, Robinson's counsel filed a reply, Dkt. 1413, and subsequently filed additional supplemental materials for the Court to consider, Dkt. 1415; Dkt. 1416.

On February 23, 2021, the Court held a hearing to address the pending motion. Robinson, his counsel, government counsel, and members of the Robinson, Lane, and Cunningham families all appeared at the hearing, and the Court heard from each. The hearing was a painful reminder of the past for all involved, and it provided a powerful display of how the past continues to haunt the lives of those who survived.

The families of the murder victims, William Cunningham and Christopher Lane, spoke of the agony they still experience as a result of William and Christopher's deaths. As William Cunningham's daughter, Shanay, explained:

> [S]omebody took my father—like cold-blooded just took my father away from me. He's never coming back, and all I'm left with are memories. I don't have no pictures with him because he was young, I was young and him and my mom had me young. All I have is my memories in my head of him. . . . That's all I had. All I've got is my memories. My father is never coming back. I'm planning right now for the day I go to heaven, how I'm going to talk to my father again, how we going to talk about everything. How I could just give him a hug, because he wasn't here. He's not here, and all I want to know is why. Why y'all didn't pick nobody else? Why my father, why me? Why? I will never get that answer.

Feb. 23, 2021 Hrg. Tr. (Rough at 31). William Cunningham's mother, Portland, also spoke. She recounted how she developed health problems after her son died, suffering a heart attack the day before the nineteenth anniversary of his death. *Id.* at 35. She also explained how her husband, William's father, "grieve[d] himself until he died" just three months after William was killed.

*Id.* at 38. The pain of reliving these tragedies was overwhelming: amidst testifying, Portland

Cunningham began to struggle breathing, *id.* at 44, and she was then rushed to the hospital,

having suffered another heart attack.

The Lane family experienced similar devastation as a result of the murders.

Christopher's mother described the horrible loss that she experienced. *Id.* at 52. Christopher's

twin sister, Kristina, wrote a statement for the Court, explaining that she not only lost her

brother, but also her fiancé, William Cunningham. Dkt. 1417-1 at 2. Kristina wrote that she

"will never find relief," *id.* at 3, and she described how, every year, she still puts Christopher's

name "on a cake of [their] favorite flavor" from when they were "growing up," *id.* at 6. She

wrote that, as her sister, Shaurice, was dying of cancer, Shaurice wept for Christopher, "wanting

to be with him." *Id.* at 8. And she conveyed her mother's suffering and her distress at not being

able to "protect any of her children[,] not from [c]ancer and not from [m]urder." *Id.* at 9.

Robinson's family members, for their part, spoke to his bleak childhood; his since-

developed maturity; and his earnest remorse for his misdeeds. Robinson's eldest sister stressed

that:

> Jonte has been incarcerated for about 18 years. While serving time at FCI
> Hazleton . . . [h]e has taken courses for anger management, parenting, and he
> also obtained his GED. . . .
>
> I understand that everyone is responsible for their actions. And my brother has
> accepted responsibility, and he is remorseful for all his actions. Moreover, I
> agree that everyone should pay for their crime. But I also believe in redemption
> and rehabilitation. Jonte was not dealt a fair hand. He had a difficult upbringing.
> . . . Jonte wasn't allowed to be a child. He had to grow up fast. We share the
> same father. Our father was a drug dealer and had 19 children. His mother was
> a drug addict. My brother's childhood was always survival mode.

Feb. 23, 2012 Hrg. Tr. (Rough at 15). His mother talked about the guilt that she carries for

having deprived Robinson of a proper childhood or a fair chance at life. She explained: "I was

not there for him.  If I could trade places with my son, take me and let him out, I would do it in a

heartbeat.  I was never there." *Id.* at 19.

Robinson also spoke.  He avowed, "there is not one day that goes by that I don't think

about the regret and pain I caused the Lane and Cunningham families." *Id.* at 28.  "Nothing that

I can do or say will bring them back.  I experienced losing a brother and uncle, and I witnessed

my best friend kill himself in front of me.  I know loss.  Nothing that anyone says will lessen

your pain.  [But] [p]lease don't allow your pain to continue to punish that boy from 20 years ago,

that boy is no longer here." *Id.* at 28–29.

After the hearing concluded, Robinson submitted supplemental materials for the Court to

consider, including additional letters in support of his release.  Dkt. 1420; Dkt. 1421; Dkt. 1423.

The government filed the victim-impact statement (discussed above) from Christopher Lane's

sister, Dkt. 1417-1 (Ex. 1), as well as a copy of Robinson's disciplinary records from his time in

prison, Dkt. 1418.  Following those submissions, the Court held a second hearing on Robinson's

motion, at which it heard from Jennifer Resh, a nurse practitioner at the Bureau of Prison's

("BOP") facility where Robinson is incarcerated.  The parties then filed additional material for

the Court to consider, including, on behalf of Robinson, an expert report from a licensed

physician who reviewed Robinson's medical records.  Dkt. 1427; Dkt. 1428; Dkt. 1429.

Robinson's motion for compassionate release, Dkt. 1404, is thus now fully briefed and ripe for

the Court's consideration.

\*   \*   \*

"There are no winners in cases like these.  But there sure are losers." *Garza v. Hargan*,

No. 17-5236, 2017 WL 9854555, at *1 (D.C. Cir. Oct. 20, 2017) (Millet, J., dissenting).

## II.  LEGAL STANDARD

Under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, a court may reduce a defendant's term of imprisonment if, "after considering the factors set forth in [18 U.S.C. § 3553(a)] to the extent they are applicable," the court finds (1) that "extraordinary and compelling reasons warrant such a reduction" and (2) "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).  As the moving party, the defendant bears the burden of establishing that he is eligible for a sentence reduction under § 3582(c)(1)(A).  *Id.*

Section 3582(c)(1)(A) also includes an exhaustion requirement, permitting a defendant to file a compassionate release motion only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  Every decision in this district "that has considered the jurisdictional or non-jurisdictional nature of the [exhaustion] mandate . . . has consistently concluded that section 3582(c)(1)(A)'s exhaustion requirement is not jurisdictional."  *United States v. Johnson*, 464 F. Supp. 3d 22, 28 (D.D.C. 2020); *see also United States v. Fields*, No. 19-cr-48, 2021 WL 780738, at *3 (D.D.C. Mar. 1, 2021); *United States v. Edwards*, No. 03-cr-234, 2020 WL 5518322, at *2 n.1 (D.D.C. Sept. 12, 2020).

### III.  ANALYSIS

**A.    Exhaustion**

The Government first argues that Robinson "has not exhausted his administrative remedy with respect to his claims regarding health conditions other than hypertension and osteoarthritis." Dkt. 1410 at 9.  The Court will not consider this argument given that "section 3582(c)(1)(A)'s exhaustion requirement is not jurisdictional," *Johnson*, 464 F. Supp. 3d at 28, and in light of the Court's ultimate conclusion that Robinson's motion will be denied even if the Court were to consider medical conditions beyond Robinson's hypertension and osteoarthritis.[4]

**B.    Extraordinary and Compelling Circumstances**

The principal question posed by Robinson's motion is whether he has shown that extraordinary and compelling circumstances warrant his compassionate release.  Although a close question, the Court concludes he has not.

1.  *Medical Conditions*

Assessing the risk that the COVID-19 pandemic poses to individual inmates is an inherently uncertain and difficult task, which requires weighing the health and age of the individual, the state of the pandemic and the corresponding science, the vaccination process, and conditions at the institution where the individual is confined.  Many of these factors can change

---

[4]  District courts have split over whether § 3582(c)(1)(A)'s exhaustion requirement limits defendants to seeking judicial review based on only those medical conditions underlying the defendant's administrative appeal.  *Compare, e.g.*, *United States v. Valenta*, No. 15-161, 2020 WL 1689786, at *1 (W.D. Pa. Apr. 7, 2020) ("To properly exhaust administrative remedies [under § 3582(c)(1)(A)] . . . the administrative complaint must raise the same claims asserted in the federal court filing.") *and* Dkt. 1410 at 13 (collecting additional authorities stating the same) *with United States v. Gluzman*, No. 7:96-cr-323, 2020 WL 4233049, at *12 (S.D.N.Y. July 23, 2020), *reconsideration denied*, No. 96-cr-323, 2020 WL 6526238 (S.D.N.Y. Nov. 5, 2020) ("[T]here is no particular value in limiting the motion a defendant can make to one based on the precise grounds presented to the BOP.") *and* Dkt. 1413-1 at 5 (collecting additional authorities, including some from this district, stating the same).

by the day, complicating matters further.  Here, Robinson is currently incarcerated at FCI Hazelton, where BOP statistics show that out of a population of over 1,800 inmates, *see FCI Hazelton*, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/haf (last visited Apr. 8, 2021, 9:50 AM), only two have recently tested positive for the virus, *see COVID-19 Cases*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus (last visited Apr. 8, 2021, 9:51 AM).  Within the broader Hazelton correctional complex, which includes FCI Hazelton and USP Hazelton (and which houses over 3,000 inmates combined), *see FCI Hazelton*, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/haf (last visited Apr. 8, 2021, 9:50 AM); *USP Hazelton*, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/haz (last visited Apr. 8, 2021, 9:54 AM), approximately 1,137 inmates have been fully vaccinated to date, *see COVID-19 Vaccine Implementation*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus (last visited Apr. 8, 2021, 9:55 AM).  The circumstances, accordingly, remain concerning but (at least at the moment) are not as dire as they were just a few months ago.  Similarly, and as explained below, Robinson's medical conditions boarder on the types of serious risks that have supported release in other cases, but, when considered in light of the likely availability of a vaccine over the next several weeks and the low number of COVID cases currently at FCI Hazelton, they are insufficient to warrant compassionate release.

Robinson argues that the following medical conditions from which he suffers, either in isolation or collectively, render COVID-19 an extraordinary threat to his life: his "physiological" age, which is considerably older than his chronological age of 39; stage II hypertension; hyperlipidemia (high cholesterol); degenerative disc disease; degenerative joint disease; osteoarthrosis; borderline obesity; low neutrophil count (neutrophils are a type of white blood cell); vitamin D deficiency; skin rashes; hallux valgus (a foot bunion); and untreated kidney

disease.  Dkt. 1404 at 1, 8–14.  Robinson also argues that his race (Black) and the results from

his recent bloodwork, which indicate that he may soon develop diabetes or heart disease, present

additional COVID-19 risk factors.  Dkt. 1404 at 29–30.  In the Court's view, based on the

current record and cognizant that the science regarding COVID-19 is still developing,

Robinson's medical conditions—with the potential exception of his undiagnosed kidney

disease—do not qualify as an extraordinary and compelling circumstance warranting his release.

To start, a number of Robinson's medical ailments—his high cholesterol, dermatitis,

osteoarthrosis, Vitamin D deficiency, low neutrophil count, and degenerative disc and joint

diseases—are not identified by the Centers for Disease Control and Prevention ("CDC") as

conditions that might increase his risk for severe illness due to COVID-19.  *See People with

Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

precautions/people-with-medical-conditions.html (last visited Apr. 2, 2021 5:48PM) (hereinafter

"CDC Risk Factors").[5]  In addition, Robinson fails to explain how his degenerative disc and joint

disease, hallux valgus, and osteoarthrosis, even might contribute to the risk that COVID-19 poses

to him, nor does he explain how those ailments are sufficiently serious on their own to merit

compassionate release.  *See* Dkt. 1404 at 8–9; *cf. also* Dkt. 1413 at 23.

Perhaps recognizing as much, Robinson argues that at least some of these conditions are

related to medical conditions present on the CDC's list.  He contends, for example, that his high

cholesterol is a type of heart disease and that his dermatitis indicates that he is

immunocompromised—two recognized risk factors.  *See* Dkt. 1404 at 24–25, 27–28.  The CDC

specifies, however, that the heart conditions that serve as risk factors are heart failure, coronary

---

[5]  The Court takes judicial notice of the material contained on the CDC website, as well as the
other online materials cited herein.  *See* Fed. R. Evid. 201(b).

artery disease, cardiomyopathies, and "possibly" hypertension. *See* CDC Risk Factors. To be sure, high cholesterol can lead to coronary artery disease, but they are not the same thing, *see Cholesterol: High Cholesterol Diseases*, Cleveland Clinic, https://my.clevelandclinic.org/health/articles/11918-cholesterol-high-cholesterol-diseases#:~:text=The%20main%20risk%20associated%20with,buildup%20is%20known%20as%20atherosclerosis. (last visited Apr. 8 2021, 11:03 AM), and Robinson offers no evidence that he suffers from coronary artery disease. Similarly, Robinson argues that his dermatitis requires the "[p]rolonged [u]se of [c]orticosteroids[,] [which] *can* cause a person to be immunocompromised or have a weakened immune system, [and] which [therefore] *may* increase a person's risk of severe illness from Covid-19." Dkt. 1404 at 28 (citation and internal quotation marks omitted) (emphasis added). But Robinson adduces no evidence that he has, in fact, become immunocompromised because of his dermatitis, or that, even if he was immunocompromised, how severe that condition is. A similar flaw attends Robinson's argument that his "recent bloodwork suggests that he may have or [will] soon develop diabetes[,] heart disease," or "rheumatoid arthritis, an autoimmune inflammatory disease." Dkt. 1404 at 1, 12. To date, Robinson has not been diagnosed with any of these ailments, *see generally* Dkt. 1411 (Ex. D) (Robinson's medical records), and the Court can only speculate about whether such a diagnosis might be forthcoming.

Of course, "while the CDC's guidance is material, it is not the only source of information about COVID-19." *United States v. Powell*, 468 F. Supp. 3d 398, 403 (D.D.C. 2020). The Court, therefore, will not reflexively "slam [shut] the compassionate release door on any inmate whose medical condition does not appear on the CDC's list." *Id.*; *see also* CDC Risk Factors ("The list [provided] does not include all potential medical conditions that could make you more likely to get severely ill."). Nevertheless, even when looking beyond CDC's identified risk

factors, the Court is not convinced that these medical conditions warrant Robinson's release.  For instance, although Robinson claims that his low neutrophil count augments the risk that COVID-19 presents, *id.* at 12, "there is no reliable data available yet" linking low neutrophil counts to "severe course[s] of [COVID-19]."  *COVID-19*, Severe Chronic Neutropenia Int'l Registry, https://severe-chronic-neutropenia.org/en/covid-19 (last visited Apr. 7, 2021, 3:41 PM).  Indeed, it appears that "patients with isolated neutropenia"—that is, lower-than-normal levels of neutrophils—"have no increased risk of contracting a viral infection."  *Id.*

Robinson's arguments based on his high cholesterol and Vitamin D deficiency also fail to explain adequately—either in qualitative or quantitative terms—the specific risk that these medical conditions pose.  As to the former, Robinson argues that "[h]igh cholesterol, by itself, has been tied to many deaths and severe cases of COVID-19."  Dkt. 1404 at 25 (citing Liji Thomas, *Does Cholesterol Play a Role in COVID-19?*, News Medical (May 12, 2020), https://www.news-medical.net/news/20200512/Does-cholesterol-play-a-role-in-COVID-19.aspx (last visited Apr. 7, 2021, 11:50 AM)).  But the article upon which Robinson relies explains that the medical study discussed was not, at that point, "peer-reviewed and, therefore, should not be regarded as conclusive, guide clinical practice/health-related behavior, or treated as established information."  *Id.*  The medical study, moreover, narrowly concluded that COVID-19 "has at least three cholesterol-dependent mechanisms that likely contribute to differential infectivity *in elderly [individuals] with an underlying condition and with chronic inflammation.*"  Hao Wang *et al.*, *The Role of High Cholesterol in Age-Related COVID19 Lethality*, bioRxiv (July 29, 2020), https://www.biorxiv.org/content/10.1101/2020.05.09.086249v4.full (last visited Apr. 8, 2021, 11:45AM) (emphasis added).  Finally, even beyond these difficulties, Robinson fails to explain how his levels of cholesterol correlate with severe cases of COVID-19.  Indeed, Robinson's

HDL, most recently measured at 72 in April 2020, Dkt. 1405-1 at 56, "is considered to be optimum and a protection against heart disease," *Cholesterol Numbers: What Do They Mean*, Cleveland Clinic, https://my.clevelandclinic.org/health/articles/11920-cholesterol-numbers-what-do-they-mean (last visited Apr. 8, 2021, 11:28 AM).  Meanwhile, Robinson's LDL—most recently measured at 105 in April 2020, Dkt. 1405-1 at 46—is not high; and his cholesterol/HDL ratio (2.7 in April 2020, *id.* at 46) is "considered very good," *Lipid Panel with Total Cholesterol: HDL Ratio*, Univ. Rochester Med. Ctr., https://www.urmc.rochester.edu/encycl opedia/content.aspx?ContentTypeID=167&ContentID=lipid_panel_hdl_ratio#:~:text=In%20gen eral%3A,1%20is%20considered%20very%20good. (last visited Apr. 8, 2021, 11:35 AM).

Robinson's argument as to his Vitamin D deficiency suffers from a similar flaw.  He contends that "Vitamin D deficiency is credibly and increasingly associated with worse outcomes from COVID."  Dkt. 1404 at 28.  But the Internet article that he cites merely asserts that "patients with *severe* vitamin D deficiency had a significantly higher mortality risk" from COVID-19.  Colby Hall, *This Vitamin Deficiency Makes Your COVID Death Risk Soar, Study Says*, BestLife (Aug. 11, 2020), https://bestlifeonline.com/covid-vitamin-d (last visited Apr. 7, 2021, 4:32 PM) (citation and internal quotation marks omitted).  Robinson, however, makes no effort to identify the severity of his Vitamin D deficiency, nor, again, does he explain the magnitude of the risk that his Vitamin D deficiency would pose even were it severe.[6]  And, finally, he says nothing about whether his Vitamin D deficiency can be treated with a daily vitamin supplement.

---

[6]  Similarly, while Robinson accurately notes that COVID-19 "disproportionately [affects] people of color," he has not established that these risks are so great to qualify as an extraordinary and compelling circumstance warranting his release.  Dkt. 1404 at 29.

To be sure, the CDC has identified a high body-mass index ("BMI") as a risk factor.  But the CDC guidance distinguishes between "obesity"—that is, a BMI over 30—and "overweight"—that is, a BMI over 25.  *See* CDC Risk Factors.  While "[h]aving obesity increases the risk of severe illness from COVID-19," "[p]eople who are overweight" merely "*may . . . be at an increased risk*" from the disease.  *Obesity, Race/Ethnicity, and COVID-19*, CDC, https://www.cdc.gov/obesity/data/obesity-and-covid-19.html (last visited Apr. 8, 2021, 11:54 AM) (emphasis added); *see also Morbidity and Mortality Weekly Report (MMWR)*, CDC, https://www.cdc.gov/mmwr/volumes/70/wr/mm7010e4.htm (last visited Apr. 8, 2021, 11:58 AM) (identifying obesity but not being overweight as "a risk factor for both hospitalization and death").  Robinson's BMI of 27.8, Dkt. 1410 at 18, places him in the overweight, not obese, category, *see* CDC Risk Factors.[7]  Similarly, even crediting Robinson's contention that his physiological age is 10 or 15 years older than his chronological age of 39, he is not in the age group most at risk—that is, those 65 years old or older.  *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Apr. 7, 2021, 4:51 PM) ("8 out of 10 COVID-19 deaths reported in the U.S. have been in adults 65 years old and older").

This, then, leaves the two more troubling health issues that Robinson raises: the fact that he suffers from stage II hypertension and the possibility that he suffers from undiagnosed chronic kidney disease—a condition that would likely put him at increased risk of severe illness should he contract COVID-19.  Dkt. 1404 at 10–13, 27; *see also* CDC Risk Factors.

---

[7]  Robinson notes that "[a] study in China found that, of 112 Covid-19 patients studied, 88 percent of those who died had BMI over 25." Dkt. 1404 at 26.  But the Court is left to wonder what percentage of those individuals had BMIs over 30, or more to the point, under 28 like Robinson.

Starting with Robinson's hypertension, the Court recognizes that this condition raises an important issue, albeit one without a clear answer. The CDC guidelines advise that hypertension "possibly" increases the risk that COVID-19 poses, but the guidelines do not specify the magnitude of that potential risk. *See* CDC Risk Factors. This contrasts with other risk factors, such as cancer, chronic kidney disease, chronic obstructive pulmonary disease, heart conditions, immunocompromised states, obesity, sickle cell disease, smoking, and Type 2 diabetes that the CDC has determined—with greater certainty—"can make you more likely to get severely ill from COVID-19." *Id.* Although Robinson correctly observes that "[t]he CDC [has] also issued separate guidance warning that persons with high blood pressure are specifically three times more likely to require hospitalization for severe COVID-19 illness," Dkt. 1413-1 at 18; *see also* Dkt. 1404-3 at 2 (Ex. C), the CDC also acknowledges that "multiple studies [have] reached different conclusions about [the] risk associated with" hypertension and that the evidence of hypertension's risk is "mixed," *Evidence Used to Update the List of Underlying Medical Conditions that Increase a Person's Risk of Severe Illness from COVID-19*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html (last visited Apr. 7, 2021 5:11 PM); *see also United States v. Wilson*, No. 18-cr-132, 2020 WL 4901714, at *5 (W.D. Wash. Aug. 20, 2020) ("As to Mr. Wilson's hypertension claim, at best, the CDC has only concluded to date that it might be a risk factor. This contention alone is not sufficient to justify or warrant conclusion that Mr. Wilson's risks of COVID19 warrant an extraordinary and compelling reason for early termination of his sentence."). In light of the uncertainties regarding the risks that stage II hypertension poses to COVID-19 patients, the Court cannot conclude, on the present record, that Robinson's hypertension constitutes an extraordinary and compelling reason warranting his release.

16

Finally, the Court turns to the prospect that Robinson might have chronic kidney disease, the most serious COVID-19-related risk that Robinson has identified.  In support of this argument, Robinson points to his recent bloodwork, which shows he has "elevated creatinine levels, and a glomerular filtration rate ('GFR') below 60."  Dkt. 1404 at 10.  According to Robinson, several medical sources indicate that these results are suggestive of chronic kidney disease.  *Id.* at 10–11 (citing *Tests to Measure Kidney Function, Damage and Detect Abnormalities*, Nat'l Kidney Found (Apr. 21, 2017), https://www.kidney.org/atoz/content/kidney tests (last visited Apr. 7, 202, 7:129 PM) ("A GFR below 60 is a sign that the kidneys are not working properly."); Jill Seladi-Schulman, *Symptoms of High Creatinine Levels* (July 24, 2019), https://www.healthline.com/health/high-creatinine-symptoms (July 24, 2019) (last visited Apr. 8, 2021, 12:11 PM) ("Generally speaking, high levels of creatinine can indicate that your kidneys aren't working well.")).  As further evidence of kidney disease, Robinson also points to his "low anion gap"—that is, a low level of albumin, a protein in the blood—as well as his dermatitis and BOP records suggesting that he suffered an "AKI," or "acute kidney injury."  Dkt. 1404 at 11 (internal quotation marks omitted).

In response, the government argues that Robinson's albumin level as measured in his urine is within the normal range.  Dkt. 1410 at 19–20.  And it further contends that Robinson's GFR readings are just under 60, suggesting that the risk of kidney disease is not particularly high.  *Id.* at 19.  Finally, the government observes that Robinson "has not been diagnosed by his BOP medical providers with chronic kidney disease, despite [his] lab results."  *Id.* at 20.  Robinson, in turn, responds that he should not be held accountable for BOP's failure to provide a full diagnostic workup and that, if anything, BOP's failure to make the diagnosis shows that he is not receiving the care that he needs while incarcerated.  Dkt. 1428 at 1–2.

On March 16, 2021, the Court held a telephonic hearing to address the parties' dispute over whether Robinson suffers from chronic kidney disease.  Dkt. 1425.  Present at the hearing was Jennifer Resh, a nurse practitioner at the BOP facility where Robinson is incarcerated, who has treated Robinson in the past.  *Id.* at 7.  The Court asked Nurse Resh her views on Robinson's blood-work results, noting that Robinson's two most recent GFR readings seem to show that he suffers from chronic kidney disease.  In response, Nurse Resh explained:

> To answer the question about the kidney disease, whenever you're reviewing the labs—that I'm assuming you have, you will see the GFR that is low.  But under there in very small print it states if they are African American, you multiply the number by 1.2.  [] Robinson is African American.  If you would multiply the most recent GFR of 57 by 1.2, his adjusted GFR is 68.  In order to diagnose someone with renal disease, the GFR must be less than 60. . . .

> [W]e we would not diagnose Inmate Robinson with a kidney disease at this point in time.  His kidney function is impaired because of his hypertension, but it's not to the point where we would actually diagnose him with kidney disease.

*Id.* at 8–9.  After Nurse Resh delivered this portion of her testimony, the Court paused to review Robinson's blood-work results itself.  And indeed, as Nurse Resh had explained, Robinson's lab results state:  "GFR units measured as mL/min/1.73 m^2.  [I]f African American, multiply by 1.210.  A calculated GFR <60 suggests a chronic kidney disease if found over a 3-month period."  Dkt. 1414 at 46, 83.  Although the lab results did not themselves apply the 1.21 multiplier to Robinson's GFR readings, with the multiplier applied, Robinson's adjusted-GFR becomes 67.76 as of November 2019, *id.* at 83, and 70.18 as of April 2020, *id.* at 46.  That falls short, according to Nurse Resh, of the GFR readings required to sustain a diagnosis of chronic kidney disease.  Dkt. 1425 at 31 (Resh) ("I actually have never—I'm fairly confident in saying never seen someone diagnose someone with a GFR greater than 60 with renal disease.").

At the Court's invitation, Robinson's counsel questioned Nurse Resh and, subsequently, submitted supplemental materials contesting her conclusions, Dkt. 1428.  In response to Nurse

Resh's explanation, Robinson offers three arguments. First, relying on the expert declaration of Dr. William Weber, a licensed physician and Clinical Associate of Emergency Medicine at the University of Chicago, Robinson argues that he either has or is on the precipice of having chronic kidney disease. *Id.* at 2–4. Second, Robinson contends that "[a] definitive diagnosis of chronic kidney disease is simply not required—in the plain text of the statute or elsewhere—to show that 'extraordinary and compelling reasons warrant a sentence reduction.'" *Id.* at 5 (quoting 18 U.S.C. § 3582(c)(1)(A)(i)). And finally, Robinson asserts that "[t]he race-based multiplier dates to a 1999 study on kidney function and raises serious concerns." Dkt. 1428 at 4 n.3 (internal quotation marks omitted).

As with his hypertension, the Court agrees that Robinson raises substantial issues but concludes that the issues are not as clear cut as he suggests. To start, although Dr. Weber opines that "Robinson suffers from long-term kidney damage," Dkt. 1428-1 at 2 (Weber Decl. ¶ 9), and "is on the edge of" chronic kidney disease, *id.* at 3 (Weber Decl. ¶ 11), he also avers that Robinson "does not yet carry the diagnosis" of chronic kidney disease, *id.*; *see also id.* at 4 (Weber Decl. ¶ 15) ("Mr. Robinson's lack of current laboratory data prevents me from concluding that he has [chronic kidney disease.]"). To be sure, Robinson's medical records are outdated, according to Dr. Weber, and thus, "it is very possible that he would currently meet criteria for [chronic kidney disease] if his labs were checked." *Id.* at 3 (Weber Decl. ¶ 11). Dr. Weber hypothesizes, presumably, that Robinson's GFR has declined in the five-and-a-half months that have passed since it was last measured. Robinson's most recent GFR results, however, have largely been stable: 56 in November 2019, 58 in April 2020, and 57 by the end of October 2020. Dkt. 1414 at 46, 83; Dkt. 1427 at 24. For Robinson to currently meet the GFR threshold for chronic kidney disease diagnosis, however, his GFR would have had to sharply

decline from 57 in October 2020 to 49.6 in April 2021. Although the Court accepts that such a precipitous decline is theoretically possible, Dr. Weber fails to explain why it is likely to have occurred here. Finally, the Court recognizes that the race-based adjustment that BOP applies to GFR readings may be the subject of dispute. But, here, Dr. Weber himself opines that "[w]hen a GFR is calculated, there is a slight adjustment if the person is of African descent," and he characterizes the pre-adjusted GFR as "uncorrected" and the post-adjusted GFR as "corrected." Dkt. 1428-1 at 2–3 (Weber Decl. ¶ 10).

The Court acknowledges that alternative methods of diagnosing chronic kidney disease beyond GFR may exist. Dr. Weber notes, for instance, that chronic kidney disease "can be diagnosed by a GFR <60 or a higher GFR if there is evidence of excess protein in the urine," *id.* at 2 (Weber Decl. ¶ 10), or "if there is other evidence of kidney damage," *id.* at 3 (Weber Decl. ¶ 11). But Dr. Weber does not aver that either of these supplementary factors currently support a diagnosis of chronic kidney disease. To the contrary, Dr. Weber states that kidney damage "is most typically evaluated by measuring the urine protein" and that in April 2020, Robinson "had a urine test that did not meet criteria for [chronic kidney disease]." *Id.* Finally, the Court also accepts Robinson's premise that the risk that COVID-19 poses to someone who, like Robinson, suffers from kidney disease does not magically appear the moment the patient's GFR falls below 60 or 49.6. But the Court lacks evidence that would permit it meaningfully to gauge the risk that Robinson faces today, and, absent further evidence, the Court cannot rely on the CDC's caution regarding chronic kidney disease (which Robinson may or may not have) alone.

Thus, as with Robinson's stage II hypertension, the Court is left with some concern about Robinson's well-being but without substantial guidance regarding the extent of the risk that he faces. Two additional factors, moreover, affect the risk that Robinson might face grave illness or

death if he is not granted compassionate release.  First, as explained above, the number of

inmates at FCI Hazelton who have recently tested positive for COVID-19 is relatively low—only

two out of a population of over 1,800 inmates.  *See COVID-19 Cases*, Fed. Bureau of Prisons,

https://www.bop.gov/coronavirus (last visited Apr. 8, 2021, 9:51 AM).  To be sure, others who

have not been tested in recent days might have the virus.  But this statistic nonetheless suggests

that virus is not currently rampant at FCI Hazelton.  That, of course, might change, particularly

as new, more transmissible variants enter the prison population.  The Court must base its

decision, however, on existing circumstances, and Robinson may renew his motion if those

circumstances change in material respects.  Second, the BOP is in the process of vaccinating

inmates and staff.  As noted above, over 1,100 inmates at FCC Hazelton (which includes FCI

Hazelton) have already been fully vaccinated.  *See COVID-19 Vaccine Implementation*, Fed.

Bureau of Prisons, https://www.bop.gov/coronavirus (last visited Apr. 8, 2021, 9:55 AM).

Although "BOP is uncertain at this time when [Robinson] can expect to be offered a vaccine,"

Dkt. 1418 at 1, Nurse Resh informed the Court that Robinson will be in the next group of

inmates who will be offered the vaccine at FCI Hazelton (although she was unsure how many

other individuals are also in that group), Dkt. 1425 at 12–13.

     The Court is thus required to evaluate Robinson's motion in the face of an array of

uncertainties and must balance imponderables against imponderables.  The Court cannot gainsay

the medical ailments from which Robinson suffers.  But on the present record, whether viewed in

isolation or combination, the Court cannot conclude that those conditions constitute

extraordinary and compelling circumstances warranting Robinson's compassionate release.  That

conclusion could change if the Court's expectation that Robinson will be offered a vaccine in the

near future proves wrong.  It could change if the spread of the virus becomes more rampant at

FCI Hazelton, if Robinson's medical condition worsens, or if further testing shows that his condition is, in fact, more severe than the Court understands. And it could change if new variants of the virus pose substantially greater risks or if the science underlying the CDC risk factors or other guidelines evolves. For now, however, the Court cannot conclude that Robinson has carried his burden of showing that the pandemic constitutes an extraordinary and compelling reason for his early release. *See* 18 U.S.C. § 3582(c)(1)(A).

    2. *Other Considerations*

Separate and apart from his medical conditions, Robinson also argues that two additional reasons warrant his compassionate release. First, "'[t]he pandemic, aside from posing a threat to [Robinson]'s health, has made [his] incarceration harsher and more punitive than would otherwise have been the case.'" Dkt. 1404 at 50 (quoting *United States v. Rodriguez*, 2020 WL 5810161, at *1 (S.D.N.Y. Sept. 30, 2020)). Second, Robinson asks the Court to consider the circumstances of his tragic childhood; to recognize that he has grown and matured since then; and to consider that Robinson's original 291-month sentence was simply too harsh in light of the circumstances. Dkt. 1428 at 14–16.

At the threshold, the Court is persuaded that it may consider these factors in the extraordinary-and-compelling-circumstances analysis, even if they do not relate to the health risk that COVID-19 poses to Robinson or to any of the bases for compassionate release that the U.S. Sentencing Commission identified prior to the passage of the First Step Act. *Cf. United States v. Shepard*, 2021 WL 848720, *4 (D.D.C. Mar. 4, 2021) (court is "not bound by the existing" Sentencing Guidelines "in determining what qualifies as 'extraordinary and compelling reasons warrant[ing]' release" (alternation in original) (quoting 18 U.S.C. § 3582(c)(1)(A)); *United States v. McCoy*, 981 F.3d 271, 286 (4th Cir. 2020) (district court "permissibly treated as

extraordinary and compelling reasons for compassionate release the severity of the defendants'

. . . sentences" (internal quotation marks omitted)); *id.* at 286 n.9 ("[T]here is no indication that

successful rehabilitation efforts may not be considered as one among other factors under

§ 3582(c)(1)(A)(i)[.]"); *United States v. Brooker*, 976 F.3d 228, 237–38 (2d Cir. 2020) (finding

district court abused its discretion when holding that length of defendant's sentence could not

"qualify as an extraordinary and compelling circumstance" as a matter of law; and noting that

defendant's "age at the time of his crime" could be considered in evaluating propriety of

sentence reduction); *United States v. Jones*, 980 F.3d 1098, 1111 (6th Cir. 2020) ("In cases

where incarcerated persons file motions for compassionate release, federal judges . . . have full

discretion to define 'extraordinary and compelling[.]'").

With that said, however, the Court is not persuaded that the arguments Robinson raises

present extraordinary and compelling circumstances warranting his release.  First, the Court

recognizes that living in a prison system that is dealing with a dangerous pandemic imposes

hardships on the entire prison population, including fear of contracting the virus, limited

activities, increased restrictions, and fewer opportunities to interact with family and other loved

ones.  But the Court is unconvinced that these hardships have so fundamentally altered the nature

of Robinson's incarceration that his sentence is now—by virtue of those additional hardships—

excessive or otherwise unjust.

Robinson's second argument also fails.  The Court is persuaded that Robinson has greatly

matured since his teenage years; it recognizes the staggering difficulties that Robinson faced in

his childhood; it is impressed by the array of support that Robinson has mustered on behalf of his

motion, *see* Dkt. 1404-5 (Ex. E) (letters in support of Robinson), including a letter from an

employee of the Education Department at FCI Hazelton, Dkt. 1423-1 at 1–2; and it credits

Robinson's expressions of profound regret for the suffering that he helped inflict on the Cunningham and Lane families, among others.  But the Court is unpersuaded that the length of Robinson's sentence and the remarkable strides that he has made—including earning his GED and, with minor exception, avoiding prison discipline over a period of many years—constitute extraordinary and compelling reasons warranting his early release.  To start, Robinson has served less than sixteen years to date, a period of incarceration that is hardly at odds with "modern sentencing regimes."  Dkt. 1428 at 15.  As Robinson himself notes, "in 2019, the median length of sentences imposed for murder was 20 years," while "[i]n 2020, the median length of sentences imposed for murder was 19 years."  *Id.* (citations omitted).  Here, Robinson pleaded guilty to criminal conduct involving *two* murders and extensive drug trafficking activity (involving a conspiracy to distribute at least thirty kilograms of mixtures and substances containing PCP, at least one kilogram of ecstasy, and at least 1.5 kilograms of crack cocaine, Dkt. 742 at 2), and thus, even accounting for good-time credit, he has yet to serve a disproportionate term.  In reaching that conclusion, the Court assumes that Robinson no longer poses a threat to community safety.  But specific deterrence is not the only goal of sentencing, and his sentence continues to "reflect the seriousness of" his crimes, to promote respect for the law, to "provide [a] just punishment for the offense[s]" that Robinson committed, and to deter others from engaging in similar criminal conduct.  18 U.S.C. § 3553(a).

The Court cannot conclude, therefore, that requiring that Robison serve any period of incarceration beyond the 15 years and 8 months that he has served to date qualifies as an extraordinary and compelling reason warranting his early release.  The Court appreciates that Robinson comes from a tragic background and that he has made great strides.  But the Court must also consider the crimes that Robinson committed, the pain that, as a younger man, he

24

inflicted on so many, and the broader damage he caused to his community.  As the Court has explained, the tragedies surrounding this case are immeasurable from every perspective, and it is the Court's responsibility to consider all of those perspectives.

## CONCLUSION

For the reasons stated above, it is hereby **ORDERED** that Robinson's Motion for Compassionate Release, Dkt. 1404, is **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  April 8, 2021